# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

**CRISTINA CORDERO,** individually and as guardian
and next friend of the minor children C.J. and J.J.       **PLAINTIFF**

v.       **CAUSE NO. 1:17CV254-LG-RHW**

**PICAYUNE SCHOOL DISTRICT; and FRANK
FORD,** in his official capacity as chief executive
of the Picayune School District       **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the [16] Motion for Summary Judgment filed by the defendants Picayune School District and Frank Ford. The defendants seek dismissal of the plaintiff's claims alleging violation of Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act. The plaintiff has responded in opposition and the defendants have replied. After due consideration of the submissions and the relevant law, it is the Court's opinion that the Motion should be granted because the plaintiffs have not exhausted their administrative remedies.

### BACKGROUND

The plaintiff alleges that she and her two minor children C.J. and J.J. suffer from branchio-oto-renal syndrome, which causes her to be deaf and her two children to be hard of hearing. The family's primary method of communication is American Sign Language ("ASL"). The children are enrolled in Picayune School District schools. The plaintiff alleges that since C.J. and J.J. were first enrolled in 2015, she made numerous requests that the District provide ASL interpretation services for

herself as a parent and for her children as students. She requested ASL interpretation services for C.J. and J.J. "with their teachers, principal, and the school board, using email and Video Relay Service telephone calls, by making in-person visits at which written notes were exchanged with school administrators and educators, and by sending written notes to school with the children." (Compl. 4, ECF No. 1). She states that she has "only been provided ASL interpretation services at IEP[1] meetings and special events." (Pl. Resp. Ex. A, at 6, ECF No. 19-1.) The District "continues to suggest that [the] boys should attend the Mississippi School for the Deaf," but Cordero does not believe that is in their best interests. (*Id.* at 2.)

In regard to J.J., Cordero alleges that the District moved him to the front of his classroom and used an assistive hearing device rather than provide him with ASL interpretation services. Cordero alleges this is insufficient to allow J.J. to effectively communicate with his teachers regarding deadlines and other assignment expectations.

In regard to C.J., Cordero alleges that the District had him examined by Dr. Luke Thompson, an ear, nose, and throat specialist, in February 2017. Cordero alleges she has not been provided with a copy of the audiology report, but believes that Dr. Thompson suggested cochlear implants for C.J. Cordero "rejects the notion

---

[1] "Under the IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE." *Fry*, 137 S. Ct. at 749.

that C.J. should conform to the expectations of mainstream hearing culture rather than have his disability accommodated . . . ." (Compl. 6, ECF No. 1.) Cordero alleges that rather than provide C.J. with ASL interpretation services, the District assigned a special education assistant to C.J. for the 2017-18 school year. Cordero alleges that because of the lack of an ASL interpreter, C.J. was unable to participate in his class play. (*Id.* at 5-6.) C.J. also received an in-school suspension because he was unable to effectively communicate with school officials in his defense. (*Id.* at 6.)

DISCUSSION

The District makes two general arguments for dismissal of this case. First, that it is immune from suit under the Eleventh Amendment. Second, that this lawsuit is subject to the Individuals with Disabilities Education Act, and Cordero has not exhausted her administrative remedies under that Act.

**1. Eleventh Amendment Immunity**

The District argues that it is immune from Cordero's ADA claims under the Eleventh Amendment. In support, the District cites two cases involving a state university. *See Dansby-Giles v. Jackson State Univ.*, 638 F. Supp. 2d 698 (S.D. Miss. 2009); *Ward v. Jackson Stae Univ.*, No. 3:11cv188-TSL-MTP, 2013 WL 75077 (S.D. Miss. Jan. 4, 2013). Because a state university is an arm of the state, the court in those decisions found that the university was immune from ADA claims. This case involves a local school district, which is not an arm of the state and therefore not entitled to Eleventh Amendment immunity. *See Black v. N. Panola*

*Sch. Dist*, 461 F.3d 584, 598 (5th Cir. 2006) ("[W]e conclude that [the school district] is not an arm of the state of Mississippi; therefore, it is not entitled to Eleventh Amendment immunity in federal or state court."). Dismissal of the ADA claims is not warranted based on Eleventh Amendment immunity.

**2. The Individuals with Disabilities Education Act**

The District argues that Cordero's ADA and Rehabilitation Act claims are, in reality, IDEA claims. IDEA claims are subject to an administrative remedy exhaustion requirement, and the District contends that Cordero failed to exhaust her administrative remedies before filing this lawsuit.

"[A] plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances – that is, when 'seeking relief that is also available under' the IDEA – first exhaust the IDEA's administrative procedures." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017); *see also Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 256 (5th Cir. 2017) ("The IDEA requires administrative exhaustion not just of claims arising under it, but also of Rehabilitation Act claims that overlap with the IDEA."). Therefore, the Court must first resolve the threshold question of whether the plaintiffs' ADA and Rehabilitation Act claims are subject to the IDEA's exhaustion requirement. The parties agree that the United States Supreme Court's decision in *Fry v. Napoleon Community Schools* governs this inquiry.

In *Fry*, the court explained the landscape of federal regulation of educational opportunities for disabled persons.

> The Individuals with Disabilities Education Act (IDEA or Act), 84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq., ensures that children with disabilities receive needed special education services. One of its provisions, § 1415(l), addresses the Act's relationship with other laws protecting those children. Section 1415(l) makes clear that nothing in the IDEA "restrict[s] or limit[s] the rights [or] remedies" that other federal laws, including antidiscrimination statutes, confer on children with disabilities. At the same time, the section states that if a suit brought under such a law "seek[s] relief that is also available under" the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures.

*Fry*, 137 S. Ct. at 748. The antidiscrimination statutes referred to by the *Fry* court include the Rehabilitation Act and the Americans with Disabilities Act. Section 504 of the Rehabilitation Act and Title II of the ADA "cover both adults and children with disabilities, in both public schools and other settings." *Id*. at 749. Both "statutes authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or other money damages." *Id*. at 750 (citing 29 U.S.C. 794a(a)(2); 42 U.S.C. § 12133).

The substantive guarantees of the Rehabilitation Act and Title II can overlap the IDEA's "core guarantee," which is "what the Act calls a 'free appropriate public education'" ("FAPE"). *Fry*, 137 S. Ct. at 748. States commit to providing a FAPE to disabled children in exchange for federal funds. *Id*. A FAPE consists of "both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id*. at 748-49 (citations omitted). "Supportive services" include "speech-language pathology and audiology services, [and] interpreting services . . . ." 20 U.S.C. § 1401(26)(A).

The IDEA provides formal procedures for resolving disputes about a FAPE.

"[A] dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides)." *Fry*, 137 S. Ct. at 749 (citing 20 U.S.C. § 1415(b)(6)). The parents "have an opportunity for an impartial due process hearing, which [is] conducted by the State educational agency or by the local educational agency as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f). Exhaustion of administrative remedies is only required when the plaintiff's lawsuit is seeking relief for the denial of a FAPE. *Fry*, 137 S. Ct. at 753.

*a) The Gravamen of Cordero's Complaint*

To determine whether Cordero's claims under the Rehabilitation Act and ADA concern denial of a FAPE and must be exhausted just like an IDEA claim, *Fry* directed the courts to "look to the substance, or gravamen, of the plaintiff's complaint." *Id*. at 752. In *Fry*, petitioner E.F. was a child with a severe form of cerebral palsy, who relied on Wonder, a goldendoodle service dog, to assist her with various life activities. *Id*. at 751. E.F.'s school opted for a human aid to provide E.F. with one-on-one support but forbade Wonder from accompanying E.F. to school. *Id*. The Frys filed suit against E.F.'s school district alleging violations of the Rehabilitation Act and ADA, which the lower court dismissed. *Id*. at 752. The lower court held that the Frys failed to first exhaust their claims via the IDEA's administrative procedures prior to asserting them in a civil suit. *Id*. On appeal, the Supreme Court remanded for the lower court to determine whether the exhaustion

requirement applied – a determination that "hinges on whether a lawsuit seeks relief from the denial of a free appropriate public education." *Id.* at 754.

*Fry* suggests the following hypothetical questions to determine "whether the gravamen of a complaint" concerns the denial of a FAPE: (1) could the claim be brought "if the alleged conduct occurred at a public facility that was *not* a school – say, a public theater or library?"; (2) "could an *adult* at the school – say, an employee or visitor – have pressed essentially the same grievance?" *Id.* at 756 (emphasis in original). The court gave an illustrative example of a child's claim that a school building lacked access ramps. *Id.* Although this claim could impact the child's FAPE, the same claim could be made by 1) an adult visitor to the school; or 2) any person if it were a municipal library or theater rather than a school that had no access ramps. *Id.* Thus, in the court's access ramp example, the gravamen of the complaint did not concern denial of a FAPE.

In addition to the two hypothetical questions designed to reveal the gravamen of the complaint, *Fry* held that the history of the proceedings, such as a plaintiff's prior pursuit of a remedy through the IDEA's administrative process, "will often provide strong evidence that the substance" of the claim concerns the denial of a FAPE. *Id.* at 757.

### i. The Two Hypothetical Questions

Asking *Fry*'s hypothetical questions in Cordero's case leads to the conclusion that the substance of Cordero's claims concerns the denial of a FAPE. For herself

and her two children, Cordero seeks relief because the District failed to provide them with educational services that would allow C.J. and J.J. to succeed in their current school despite their disabilities. The heart of the Complaint is the allegation that C.J. and J.J. are receiving and continue to receive "objectively substandard and inferior" educational and instructional services from the District. (Compl. 7 (¶37), ECF No. 1.) Thus, the answer to the first question posed by *Fry* is "no," because Cordero's claims are for what only a student may seek – effective educational supportive services that accommodate disability. These claims cannot be transposed to a public facility that is not a school. As to the second question, there would also be no basis for an employee or visitor to press essentially the same grievance regarding the lack effective educational supportive services. Therefore, Cordero's "allegations concern the denial of a FAPE and foreclose the conclusion that [the plaintiff] could have brought the same complaint against another public facility or that an adult at the school could have brought the same complaint." *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 135 (3d Cir. 2017); *see also L.G. ex rel. G.G. v. Fayette Cty. Ky. Bd. of Educ.*, No. CV 5:18-202-DCR, 2018 WL 2944156, at *3 (E.D. Ky. June 12, 2018) (claim that child was deprived of adequate educational services could not be brought against another public facility); *P.G. ex rel. R.G. v. Rutherford Cty. Bd. of Educ.*, No. 3:17cv1115, 2018 WL 2416230, at *6 (M.D. Tenn. May 29, 2018) (claims implicating individualized instruction and related support services concerned denial of a FAPE); *Rhodes v. Lamar Cty. Sch. Dist.*, No. 2:16cv195-KS-MTP, 2018 WL 1527876, at *5 (S.D. Miss. Mar. 28, 2018)

(claims that directly relate to educational needs concern denial of a FAPE); *A.R. v. Sch. Admin. Unit #23*, No. 15-cv-152-SM, 2017 WL 4621587, at *5-6 (D.N.H. Oct. 12, 2017) (claims indicated that plaintiffs were dissatisfied with level of services or support provided by school district and therefore concerned denial of a FAPE).

Cordero also claims that she cannot meaningfully participate in C.J. and J.J.'s education because the District has not provided ASL interpretation services for her during all school meetings and events. "Parents enjoy rights under IDEA; and they are, as a result, entitled to prosecute IDEA claims on their own behalf [so that they may have] meaningful opportunities to participate in the education of their children at school and at home." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007). Cordero's claims are subject to the IDEA exhaustion requirement for the same reason as above: claims that the District has provided inadequate supportive services for her childrens' education concern denial of a FAPE.

### ii. The History of Proceedings

Cordero asserts that she only inadvertently went down the IDEA procedural path with the District. She states in her affidavit that one meeting she thought was going to address bullying of C.J. turned out to concern C.J.'s individualized education program instead. (Pl. Resp. Ex. A, at 3, ECF No. 19-1.) She also argues she did not know that when she asked for a meeting with the District superintendent to complain that her sons would not receive ASL interpretation services that the District would consider the meeting to be an appeal under the

IDEA. She argues that these "misunderstandings and miscommunications which have characterized [my] dealings with the District" show that the history of the proceedings should carry no weight. (Pl. Resp. Mem. 23, ECF No. 20.)

However, the Court does not find it appropriate to disregard the District's documentation of Cordero's efforts to obtain, and the District's efforts to provide, FAPEs for C.J. and J.J., which included accommodation for Cordero's disability so that she could participate in her children's education. (*See* Def. Mot. Ex. 1, ECF No. 16-1.) The documentation is voluminous and spans three years, from 2015 to shortly before this lawsuit was filed in 2017. This history adds weight to the conclusion that Cordero's Rehabilitation Act and Title II claims are in reality for denial of a FAPE and subject to the IDEA.

*b) Exhaustion of Administrative Remedies*

The District provided an affidavit from its Director of Exceptional Education detailing the history of the communications between the District and Cordero between 2015 and 2017. (Def. Mot. Ex. 1, ECF No. 16-1.) These communications include individualized education program meetings with Cordero concerning C.J. and J.J., and other, more informal communications about the children's progress and medical conditions. The Director notes a number of occasions when Cordero was provided with the Procedural Safeguards Notice setting out the dispute resolution procedure, and Cordero acknowledged her receipt of the Notice. (See Def. Mot. Ex. 1 at 6, 48, 49, 78, 156) (ECF pagination). Nevertheless, Cordero did not pursue any remedies after her meeting with the Superintendent resulted in

affirmation of the decision not to provide ASL interpretation services.  She has therefore not exhausted her administrative remedies.

The exhaustion requirement may only be excused if Cordero proves futility or inadequacy, and she has not made any arguments that either exception applies. *See Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d 108, 112 (5th Cir. 1992) (quoting *Honig v. Doe*, 484 U.S. 305, 327(1988)).  Thus, Cordero fails to show that pursuing administrative remedies would be futile or inadequate.  The Court will grant the District's Motion for Summary Judgment as to Cordero's Title II and Rehabilitation Act claims.  Because they are dismissed on exhaustion grounds and the futility or inadequacy of future exhaustion has not been argued, the Court finds that they should be dismissed without prejudice.  *See Rhodes*, 2018 WL 1527876, at *5.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [16] Motion for Summary Judgment filed by the defendants Picayune School District and Frank Ford is **GRANTED**.  Plaintiff's claims against the defendants are **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies.

**SO ORDERED AND ADJUDGED** this the 29th day of June, 2018.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE